IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

FEBRUARY SESSION, 1995



**FILED**

**August 2, 1996**
**Cecil Crowson, Jr.**
Appellate Court Clerk

STATE OF TENNESSEE,    )
        )
    Appellee,    )    No. 02C01-9409-CR-00186
        )
        )    Shelby County
v.    )
        )    Hon. W. Fred Axley, Judge
        )
DEREK DENTON,    )    (Aggravated burglary; aggravated
        )    assault; criminally negligent homicide)
    Appellant.    )

For the Appellant:    For the Appellee:

Marvin E. Ballin    Charles W. Burson
200 Jefferson Avenue    Attorney General of Tennessee
Suite 1250    and
Memphis, TN  38103    Charlette Reed Chambers
    Assistant Attorney General of Tennessee
    450 James Robertson Parkway
    Nashville, TN 37243-0493

    John W. Pierotti, Jr.
    District Attorney General
    and
    James J. Challen
    Assistant District Attorney General
    201 Poplar Ave.
    Memphis, TN 38103-1947

OPINION FILED: _____

CONVICTIONS FOR AGGRAVATED BURGLARY AND CRIMINALLY NEGLIGENT
HOMICIDE AFFIRMED; CONVICTION FOR AGGRAVATED ASSAULT REDUCED
TO ASSAULT; SENTENCES MODIFIED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Derek C. Denton, appeals as of right from his convictions by a jury in the Shelby County Criminal Court for aggravated burglary and aggravated assault, Class C felonies, and criminally negligent homicide, a Class E felony. As a Range I, standard offender, he received six-year sentences and was fined $10,000 for each of the aggravated burglary and aggravated assault convictions and a two-year sentence and $2,500 fine for the criminally negligent homicide conviction. The defendant was ordered to serve each sentence consecutively, for an effective sentence of fourteen years, in the local workhouse. The defendant presents the following issues for our review:

(1) whether the evidence was sufficient to support the defendant's convictions;

(2) whether the trial court properly charged the jury on circumstantial evidence;

(3) whether the trial court properly charged the jury on the prosecution's burden of proof; and

(4) whether the defendant's sentence was excessive.

The defendant was charged with breaking into his former girlfriend's apartment, assaulting her, and killing Adrian Williamson. Officer William Chester Sweet and Officer Eric Dates of the Memphis Police Department testified that they answered a disturbance call at Joanne Woodson's ninth-floor apartment on May 8, 1993. When Ms. Woodson answered the door, Officer Sweet testified that she was upset and holding her face. He stated that the right side of her face was swollen where she had been hit. Officer Sweet also testified that the chain lock on the entrance door of the apartment had been forced out of the wall. Officer Dates testified that the bedroom window was open and when he looked outside, he saw the deceased lying face down on a ledge approximately eight stories below the window. Officer Dates stated on

2

cross-examination that he did not remember if there was any evidence of a struggle in the bedroom.

Dr. O'Brian Clary Smith, an assistant medical examiner for Shelby County, testified that he performed an autopsy on the deceased on May 11, 1993. He stated that the deceased, who was 5'11" and weighed 190 pounds, died as a result of multiple injuries that were consistent with a high velocity fall onto a hard surface. He testified that the deceased's fingernails showed evidence of delamination, or splitting into layers, which is consistent with the edge of the fingernail being scraped against a high friction surface. Dr. Smith also testified that the deceased had a blood blister on his right index finger, which could have been caused by "some degree of compressive force [being placed upon] the fingertip" and then the finger being forcibly moved. He stated that the deceased's blood alcohol content was .02 percent, but his urine was negative for the presence of alcohol. Also, the deceased's blood and urine were negative for the presence of drugs. Dr. Smith testified on cross-examination that the deceased was not tested for marijuana.

Laquinton Cortez Underwood testified that he went to Ms. Woodson's apartment with the defendant on May 8, 1993, to help the defendant get his clothes and property. He stated that Ms. Woodson told the defendant to leave when he knocked on the door, but the defendant used his key to unlock the door and then kicked the chain lock off with his foot. He testified that the deceased ran into the bedroom when the defendant entered the apartment and began arguing with Ms. Woodson. He stated that Ms. Woodson appeared to be drunk and he saw a bottle of clear liquor in her apartment. Mr. Underwood testified that after the defendant struck Ms. Woodson and knocked her unconscious, the defendant poured two jugs of water on her face in an attempt to revive her. The defendant then went into the bedroom to retrieve his possessions and Mr. Underwood heard him tell the deceased "[t]o find his best way out

3

the house was out through the window." Mr. Underwood stated that when he went into the bedroom and did not see the deceased, he looked out the window and saw the deceased lying outside. He told the defendant that the deceased was lying outside on the ledge of the apartment building, but the defendant refused to believe him. Mr. Underwood testified that he then helped the defendant take his possessions to the defendant's mother's house. Mr. Underwood ultimately pled guilty to criminal trespassing.

Joanne Woodson testified that she had been engaged to the defendant, but she had ended the relationship approximately two weeks before the night in question. She stated that the defendant had previously told her that he would hurt her and anyone she was with if she ever tried to leave him. On May 8, 1993, she stated that she and the deceased walked to the liquor store and then came back to her apartment. She testified that although she was drinking vodka, she never saw the deceased drink any alcoholic beverage. At approximately 8:30 p.m., the defendant came to her apartment with Mr. Underwood. She told the defendant that he could not come in, but he broke the chain lock off the door.[1] She stated that they argued and the defendant began hitting her. Ms. Woodson testified that the defendant knocked her unconscious and she heard him yelling in the bedroom when she awoke. The defendant then gathered his possessions and left. She testified that the bedroom window was closed before the defendant came into the apartment. Ms. Woodson testified that the defendant called her from jail after he was arrested and she asked him "why he had thrown [the deceased] out the window." She stated that the defendant told her that "[h]e was drunk, and he didn't mean to."

The defendant testified that he dated Ms. Woodson and frequently stayed at her apartment, until she ended the relationship sometime prior to the incident on May

---

[1] Ms. Woodson admitted on cross-examination that she did not remember telling the police that she opened the door and allowed the defendant inside her apartment.

4

8, 1993. However, he stated that he continued to stay at her apartment and last spent the night there some four days before the incident. On May 8, the defendant called Ms. Woodson and informed her that he was coming to her apartment to pick up his possessions. He stated that when he arrived, he unlocked the door with his key because loud music was playing inside the apartment and Ms. Woodson did not hear his knocks on the door. However, he admitted on cross-examination that after unlocking the door, he kicked it open and broke the chain lock. He testified that when he opened the door, the deceased ran into another room and the defendant began arguing with Ms. Woodson. The defendant stated that Ms. Woodson was drunk when he arrived and they began to argue and to hit each other. Ms. Woodson fell down because the defendant "hit her probably a little too hard." He stated that she was unconscious for approximately one minute, during which time the defendant poured two glasses of water on her face to revive her. The defendant then went through the bedroom to retrieve his clothes from the bathroom closet, but he did not see the deceased.

The defendant testified that the bedroom window in Ms. Woodson's apartment opened approximately twenty-eight inches. He stated that he noticed that the window was open and the air conditioner was on when he walked through the bedroom to get his clothing. He explained that his fingerprints were on the window because he had stayed in the apartment "four days before the murder." He denied seeing, touching, or threatening the deceased while in the bedroom. The defendant also stated that he did not remember telling the deceased to jump out the window. He testified that he thought the deceased had left the apartment by running past Mr. Underwood and refused to believe Mr. Underwood when he said that the deceased had jumped out the window. The defendant stated that he turned himself in to the police on Mother's Day because Mr. Underwood had been picked up for questioning and the

5

defendant "got tired of waiting." After signing a waiver of his rights, the defendant told the police that he did not kill the deceased.

## I

In his first issue, the defendant contends that the evidence is insufficient to support his convictions because the state did not prove the elements of each of the offenses beyond a reasonable doubt. With respect to his conviction for criminally negligent homicide, he argues that a reasonable doubt exists as to his guilt because the state failed to present any direct evidence showing that he caused the death of Adrian Williamson. Criminally negligent conduct that results in death constitutes criminally negligent homicide. T.C.A. § 39-13-212. Criminal negligence requires "a substantial and unjustified risk . . . of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." T.C.A. § 39-11-302(d).

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The defendant contends that his conviction for criminally negligent homicide was based solely upon circumstantial evidence. For circumstantial evidence

to constitute the sole basis for a conviction the facts must be "so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." State v. Crawford, 225 Tenn. 478, 484, 470 S.W.2d 610, 613 (Tenn. 1971). The evidence must be both consistent with the defendant's guilt and inconsistent with the defendant's innocence, exclude all other reasonable theories except that of guilt, and establish the defendant's guilt so as to convince the mind beyond a reasonable doubt that he or she committed the crime. Patterson v. State, 4 Tenn. Crim. App. 657, 661, 475 S.W.2d 201, 203 (Tenn. Crim. App. 1971).

We disagree with the defendant's contention that his conviction for criminally negligent homicide was based solely on circumstantial evidence. In State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975), our supreme court explained that direct evidence is "evidence which, if believed, proves the existence of the fact in issue without inference or presumption, whereas circumstantial evidence, without going directly to prove existence of a fact, gives rise to a logical inference that such fact exists." A defendant's confession to a crime is direct evidence. Monts v. State, 379 S.W.2d 34, 40 (Tenn. 1964). In this case, Ms. Woodson testified that when she asked the defendant why he killed Adrian Williamson, the defendant responded by saying that he was drunk and "he didn't mean to." The defendant's acknowledgment that he killed the victim is direct evidence of his guilt.

Also, when viewed in the light most favorable to the state, other evidence presented at the defendant's trial was corroborative of his guilt. When the defendant entered Ms. Woodson's apartment, the deceased ran into the bedroom. After fighting with Ms. Woodson, the defendant also went into the bedroom. Both Ms. Woodson and Mr. Underwood stated that the defendant was yelling while in the bedroom. Mr. Underwood heard him tell the deceased "[t]o find his best way out [of] the house . . . through the window." Ms. Woodson testified that the window was closed before the

7

defendant's arrival. However, when Mr. Underwood entered the bedroom, the window had been opened. When Mr. Underwood looked out the window, he saw that the deceased had fallen to his death. Also, Dr. Smith testified that the victim's fingernails were frayed, as if they had been scraped across a rough surface and the victim had a blood blister on his right index finger that was consistent with the finger being forcibly moved while there was compressive force against it. We conclude that ample evidence was presented for the jury to conclude beyond a reasonable doubt that the defendant's conduct resulted in the victim's death.

Next, the defendant contends that the evidence was insufficient to support his conviction for aggravated assault. The defendant admitted at trial that he struck Ms. Woodson in the face and, thus, assaulted her. See T.C.A. § 39-13-101(a)(1). However, he contends that the state failed to prove beyond a reasonable doubt that Ms. Woodson suffered serious bodily injury, an essential element of aggravated assault. The state counters that the proof sufficiently demonstrated that Ms. Woodson suffered extreme physical pain and protracted unconsciousness and thus sufficiently established serious bodily injury.

Under T.C.A. § 39-13-102(a)(1)(A), aggravated assault is an assault that results in serious bodily injury, as opposed to just bodily injury. Bodily injury is defined as "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2). "Serious bodily injury" is defined as bodily injury involving:

> (A)  A substantial risk of death;
>
> (B)  Protracted unconsciousness;
>
> (C)  Extreme physical pain;
>
> (D)  Protracted or obvious disfigurement; or
>
> (E)  Protracted loss or substantial impairment
>       of a function of a bodily member, organ

8

or mental faculty.

T.C.A. § 39-11-106(a)(33). We conclude that Ms. Woodson's injuries were not severe enough to constitute the "serious bodily injury" necessary for a conviction of aggravated assault.

Officer Sweet testified that Ms. Woodson was crying and holding her face when he answered the disturbance call at her apartment and that she had obviously been struck in the face. Mr. Underwood testified that the defendant hit Ms. Woodson several times, knocked her unconscious, and then poured water on her in order to revive her. He said that she was unconscious for about a minute. Ms. Woodson testified that the defendant came into the apartment and started beating her. She stated that he knocked her unconscious for an indeterminate amount of time, and that the defendant had gone into the bedroom by the time she awoke. After the police arrived, Ms. Woodson was taken to the hospital to be treated for her injuries, which included a blackened eye, a busted lip, and a cut above her eyebrow. However, Ms. Woodson testified that she was only at the hospital for approximately ten to fifteen minutes.

The state contends that the defendant committed aggravated assault because Ms. Woodson suffered extreme physical pain. However, there was no testimony as to the degree of her injuries or the pain that she suffered. The physician that treated her at the hospital did not testify. Also, the victim did not testify that her injuries caused extreme physical pain. The only evidence as to the extent of Ms. Woodson's injuries was testimony that she received cuts and a blackened eye and a photograph depicting these injuries. Although Ms. Woodson suffered injuries that may have been painful, she did not suffer pain extreme enough to constitute serious bodily injury. See State v. Sims, 909 S.W.2d 46, 48-49 (Tenn. Crim. App.), app. denied

9

(Tenn. 1995) (Victim who received a broken nose and black and blue eyes did not suffer the extreme physical pain that comprises serious bodily injury.).

With regard to the state's contention that Ms. Woodson suffered "protracted unconsciousness," we start by recognizing that the provisions of the criminal code are to be construed by the fair import of their terms. See T.C.A. § 39-11-104. This includes relying upon the natural and ordinary meaning of the language used. See, e.g., State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). "Protracted" is an adjective used to describe something that is delayed or prolonged in time. See Merriam Webster's Collegiate Dictionary 939 (10th ed. 1994); American Heritage Dictionary 568 (1975). Both the defendant and Mr. Underwood testified that Ms. Woodson was unconscious for approximately one minute. The victim was unsure as to how long she was unconscious. In order to constitute "serious bodily injury," the victim must suffer "protracted unconsciousness." The fact that the victim was unconscious for such a short amount of time does not satisfy the definition of "protracted unconsciousness" necessary to establish serious bodily injury. Cf. State v. Bill Nelson Narrimore, No. 03C01-9308-CR-00276, McMinn Co. (Tenn. Crim. App. Jan. 11), app. denied (Tenn. May 8, 1995) (The victim suffered protracted unconsciousness when he was knocked unconscious in a parking lot and then transported to a hospital, where he remained unconscious until he was in a helicopter being flown to another hospital.). We conclude that there is insufficient evidence to support the serious bodily injury necessary for an aggravated assault conviction. Therefore, the defendant's conviction must be modified to assault.

Finally, the defendant asserts that he should not have been convicted of aggravated burglary because the state failed to prove beyond a reasonable doubt that he entered Ms. Woodson's apartment with the intent to commit aggravated assault. He

10

states that his only purpose in entering her apartment was to retrieve his personal belongings.

A person commits aggravated burglary by entering a habitation without the effective consent of the property owner, with the intent to commit a felony. T.C.A. §§ 39-14-402(a)(1), -403(a). Aggravated assault is a Class C felony. T.C.A. § 39-13-102(b). The defendant testified that he called Ms. Woodson and asked if he could come to her apartment, but she refused. The defendant went to her apartment anyway and kicked in the door and broke the chain lock when she would not allow him inside. Also, Ms. Woodson testified that the defendant had threatened to hurt her "if [she] ever tried to leave him or break up with him." She stated that she had recently ended her relationship with the defendant at the time of the incident at her apartment. Based upon the testimony that the defendant had previously threatened to harm Ms. Woodson and then violently kicked in the door of her apartment and assaulted her, the jury was entitled to infer that the defendant entered her apartment without her consent with the intent to commit an aggravated assault against her, even though her injuries only supported a misdemeanor assault.

## II

The defendant challenges his conviction for criminally negligent homicide based upon the trial court's failure to instruct the jury properly regarding circumstantial evidence. He argues that his conviction for criminally negligent homicide is based solely upon circumstantial evidence and that the trial court erred by failing to instruct the jury that before an accused can be convicted of a criminal offense based solely on circumstantial evidence, the "facts and circumstances must . . . exclude every other reasonable hypothesis save the guilt of the defendant."

The trial court gave the following instruction on circumstantial evidence:

11

> Evidence may be direct or circumstantial. Direct evidence is testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact but which do not directly prove the fact in issue. By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence such as a turned on garden hose, may explain the water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.
>
> You are to consider both direct and circumstantial evidence. The law permits you to give equal weight to both, but it is for you to decide how much weight to give to any evidence.

Although defense counsel objected to this instruction at trial and told the court that he intended to request the "old pattern instruction," he never submitted a written request for a different instruction, see Tenn. R. Crim. P. 30, nor did he specify that he wanted the jury charged with respect to weighing circumstantial evidence in a solely circumstantial case.

A trial court has a duty to give a complete charge of the law applicable to the facts of the case. State v. Thompson, 519 S.W.2d at 792. When all the proof in a case is circumstantial, the trial court has a duty to charge the jury as to the law of weighing circumstantial evidence even if such an instruction is not requested. Id. However, when the proof in a case consists of both direct and circumstantial evidence an instruction on the law for weighing solely circumstantial proof must be given only if the defendant requests it. Monts v. State, 214 Tenn. 171, 379 S.W.2d 34, 40 (1964).

As previously noted, the proof in this case consists of both direct and circumstantial evidence. Although the defendant argues that the trial court erred by failing to instruct the jury concerning the weight to be given circumstantial evidence in a solely circumstantial case, he never requested such an instruction at trial. Instead, he made only a broad assertion that he wanted to request a pattern instruction. The trial

court did not err by failing to give a complete instruction on weighing circumstantial evidence because the defendant did not request one. Furthermore, even if we were to interpret defense counsel's remarks as a request for a complete instruction on weighing circumstantial evidence, the defendant would not be entitled to relief. Rule 30, Tenn. R. Crim. P., requires a request for a special jury instruction to be in writing. Absent a written request, a trial court's refusal to give a special instruction is not error. State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App.), app. denied (Tenn. 1982).

### III

Next, the defendant contends that the trial court improperly instructed the jury regarding the burden of proof because it did not instruct the jury that the state had the burden of proving the defendant's guilt to a moral certainty. The trial court gave the following reasonable doubt instruction:

> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.
>
> It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by law to convict of any criminal charge.
>
> A reasonable doubt is just that--a doubt that is reasonable after an examination of all the facts of this case.
>
> If you find the State has not proven every element beyond a reasonable doubt, then you should find the defendant not guilty.

See T.P.I.-Crim. 2.03(a) (4th ed.). Defense counsel objected to this instruction at trial because it does not include "moral certainty." Although the defendant contends on appeal that the trial court erred by failing to give T.P.I.-Crim. 2.03 (4th ed.), he did not request that instruction at trial.

We agree with the defendant, though, that T.P.I.-Crim. 2.03 (4th ed.) correctly states the burden of proof for criminal convictions in Tennessee:

13

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

See Hardin v. State, 210 Tenn. 116, 355 S.W.2d 105 (1962); State v. Sexton, 917 S.W.2d 263, 266 (Tenn. Crim. App. 1995). However, we also note that Tennessee law does not mandate any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. State v. West, 844 S.W.2d 144, 151 (Tenn. 1992).

In this case, the trial court refused to include "moral certainty" in its charge to the jury because it was concerned about the constitutionality of using the phrase in a reasonable doubt instruction after the Supreme Court's decision in Cage v. Louisiana, 498 U.S. 39, 111 S. Ct. 328 (1990). In Cage, the Supreme Court held unconstitutional an instruction which equated reasonable doubt with "substantial doubt" and "grave uncertainty." The Court held that "[w]hen those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."

In Victor v. Nebraska and Sandoval v. California, ____ U.S. ___, 114 S. Ct. 1239 (1994), the Supreme Court further explained the relationship of reasonable doubt to the "moral certainty" phrase. The Court indicated that the phrase "moral certainty" may have lost its nineteenth century meaning relative to the level of certainty humanly attainable in matters relating to human affairs. It recognized that a modern jury, unaware of the historical meaning, might understand the phrase, in the abstract, to mean something less than the very high level of certainty constitutionally required in criminal cases. Although it expressed criticism of the continued use of the "moral

14

certainty" phrase, the Court did not actually hold that it was constitutionally inappropriate, but looked to the full charge to the jury to determine if the phrase was placed in such a context that a jury would understand that it meant certainty with respect to human affairs.

In the context of T.P.I.-Crim. 2.03 (4th ed.), use of the phrase "moral certainty" is appropriate. See Nichols v. State, 877 S.W.2d 722, 734 (Tenn. 1994), cert. denied, 115 S. Ct. 909 (1995); State v. Sexton, 917 S.W.2d at 266; Pettyjohn v. State, 885 S.W.2d 364, 366 (Tenn. Crim. App.), app. denied (Tenn. 1994); State v. Hallock, 875 S.W.2d 285, 294 (Tenn. Crim. App. 1993), app. denied (Tenn. 1994). But see Rickman v. Dutton, 864 F.Supp. 686 (M.D. Tenn. 1994). In this case, though, the defendant did not request T.P.I.-Crim. 2.03 (4th ed.) or any other specific reasonable doubt instruction. See Tenn. R. Crim. P. 30. Given the Supreme Court's criticism of the "moral certainty" terminology and the importance of looking to the full charge to determine whether the phrase is placed in the appropriate context, we cannot conclude that the trial court erred by refusing to include the phrase "moral certainty" in its charge.

However, we remain concerned about the reasonable doubt instruction given in this case. Our supreme court recently addressed the standard of proof for criminal trials in Tennessee in Nichols v. State, 877 S.W.2d at 734. In Nichols, the defendant challenged the reasonable doubt instruction the trial court gave during the penalty phase of his trial. The instruction at issue stated that the jury must find proof "'beyond a reasonable doubt' and be convinced to a 'moral certainty' of the existence of the aggravating circumstances and of the fact they outweighed the mitigating circumstances." The instruction defined reasonable doubt as a "'doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict.'" Nichols, 877 S.W.2d at 734.

Our supreme court held that the instruction was a proper statement of the evidentiary certainty required by our state and federal constitutions.

The instruction in Nichols and the instruction in T.P.I.-Crim. 2.03 (4th ed.), which this court has repeatedly approved, see, e.g., Sexton, 917 S.W.2d at 266; Pettyjohn, 885 S.W.2d at 366; Hallock, 875 S.W.2d at 293-94, both emphasize the high level of certainty required for a conviction. T.P.I.-Crim. 2.03 (4th ed.) defines reasonable doubt as a "doubt engendered by an investigation of all the proof in the case and an inability after such an investigation, to let the mind rest easily as to the certainty of guilt" (emphasis added). In this fashion, although the instruction states that the law does not require absolute certainty for a conviction, it explains the level of certainty required in more than just terms of moral certainty.

The instruction given in this case did not focus on the certainty that a jury must attain to convict a defendant. Instead, it tended to emphasize the lack of certainty that is permissible under the reasonable doubt standard. The trial court defined reasonable doubt as "a doubt based upon reason and common sense after careful and impartial consideration of all the evidence" and then instructed the jury that absolute certainty of the defendant's guilt was not necessary to convict him. The trial court then restated its definition of reasonable doubt and explained that the state had the burden of proving the defendant's guilt beyond a reasonable doubt. Because we are concerned that this instruction does not adequately convey the evidentiary certainty required under the reasonable doubt standard, as it has been historically used and understood in Tennessee, see, e.g., Owen v. State, 89 Tenn. (5 Pickle) 704, 705-06 (1891); Hardin, 355 S.W.2d at 108, we caution trial courts against using it, and we believe that T.P.I.-Crim. 2.03 (4th ed.) should be used even if it is not requested by a party.

16

**IV**

The defendant's final contention is that his sentence was excessive. He contests the denial of probation and the length and consecutive nature of his sentences. The trial court sentenced the defendant, a Range I standard offender, to the maximum sentence for each offense and ordered that the sentences be served consecutively.

Appellate review of sentencing is <u>de novo</u> on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. §§ 40-35-210(f) (1990).

<u>State v. Jones</u>, 883 S.W.2d at 599 (Tenn. 1994).

17

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range unless there are enhancement factors present. T.C.A. § 40-35-210(c).[2] Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

**A**

Regarding the length of his sentences, the defendant contends that the trial court improperly enhanced his sentences for criminally negligent homicide, aggravated burglary, and aggravated assault and erred by refusing to apply any mitigating factors. The trial court applied the following factors to enhance all three of the sentences:

> (2) the defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

---

[2] For Class A felonies committed on or after July 1, 1995, the presumptive sentence is the midpoint of the range. See 1995 Tenn. Pub. Acts, ch. 493 (amending T.C.A. § 40-35-210(c)).

(6) the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great;

(10) the defendant had no hesitation about committing a crime when the risk to human life was high;

(16) the crime was committed under circumstances under which the potential for bodily injury to a victim was great.

T.C.A. § 40-35-114. In addition, the trial court enhanced the defendant's sentence for criminally negligent homicide because it found that the defendant inflicted bodily injury on another person during the commission of the offense. See T.C.A. § 40-35-114(12).

Enhancement factors must be appropriate for the offense and cannot be essential elements of the offense. T.C.A. § 40-35-114. With this in mind, we must consider the particular circumstances of this case to determine the applicable enhancement factors. Jones, 883 S.W.2d at 601.

With respect to the criminally negligent homicide conviction, we conclude that the trial court incorrectly applied every enhancement factor except factor (12). This factor may be used when, during the commission of a felony, the defendant willfully inflicts bodily injury upon another person or his actions result in the death or serious bodily injury to a victim or a person other than the victim. T.C.A. § 40-35-114 (12). In this case, the record supports the trial court's finding that the defendant willfully inflicted bodily injury upon Ms. Woodson during the commission of the criminally negligent homicide.

The trial court improperly enhanced the defendant's sentence for criminally negligent homicide by finding that the defendant was a "leader in the commission of an offense involving two or more criminal actors." See T.C.A. § 40-35-114(2). Although the proof established that Mr. Underwood accompanied the defendant to Ms. Woodson's apartment, none of the proof at trial or at the sentencing

19

hearing implicated him in the death of the deceased. Because the evidence does not support the trial court's finding that anyone other than the defendant was involved in the death of the deceased, enhancement factor (2) is inapplicable to the defendant's sentence for criminally negligent homicide.

The trial court also erred by applying enhancement factor (6), regarding particularly great injury to a victim, to the defendant's sentence for criminally negligent homicide. Particularly great injury to a victim is an essential element of criminally negligent homicide because no greater injury than death can be inflicted on a person. See State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987).

Similarly, the trial court erred by applying factor (10) to the defendant's sentence for criminally negligent homicide because the risk to human life is always high in a homicide case. Because there was "no risk to the life of a person other than the victim", factor (10) is inapplicable. State v. Bingham, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995).

Factor (16) also does not apply to enhance the defendant's sentence for criminally negligent homicide. An essential element of criminally negligent homicide is that the defendant's conduct create a substantial and unjustifiable risk that results in the victim's death. T.C.A. §§ 39-13-212(a); 39-11-302(d). The same facts necessary to establish this element encompass the proof necessary to show that "the potential for bodily injury to a victim was great." See T.C.A. § 40-35-114(16); Bingham, 910 S.W.2d at 452.

With respect to the defendant's sentence for aggravated burglary, we conclude that the trial court properly applied factors (6), (10), and (16), regarding the infliction of particularly great injuries on a victim, the creation of a high risk to human

20

life, and the commission of a crime under circumstances evidencing a great potential for bodily injury to a victim. We also conclude that the trial court erred by enhancing the defendant's sentence based upon factor (2), but that the record supports the application of two enhancement factors not considered by the trial court, factors (3) and (12).

The trial court properly enhanced the defendant's sentence for aggravated burglary based upon the infliction of particularly great injury on a victim. See T.C.A. § 40-35-114(6). Initially, we note that particularly great injury to a victim is not an essential element of aggravated burglary that is based on the defendant's intent to commit aggravated assault. The indictment for aggravated burglary charged the defendant with entering Joanne Woodson's habitation without her consent and with the intent to commit aggravated assault. We recognize that factor (6) is an essential element of aggravated assault causing serious bodily injury because "proof of serious bodily injury will always constitute proof of particularly great injury." Jones, 883 S.W.2d at 602. However, it does not follow that factor (6) is an essential element of aggravated burglary that is based on a defendant's intent to commit aggravated assault. As the facts of this case demonstrate, proof of serious bodily injury is not essential to proving the defendant's intent to commit aggravated assault.

Moreover, the evidence in this case supports application of factor (6) to the defendant's sentence for aggravated burglary. Factor (6) applies when a victim of a crime suffers particularly great personal injuries. See T.C.A. § 40-35-114(6). In this case, both Joanne Woodson and Adrian Williamson were victims of the aggravated burglary because both were lawfully present in Ms. Woodson's apartment at the time of the burglary and both were injured by the defendant during the burglary. See State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App.), app. denied (Tenn. 1994) (defining victim under T.C.A. § 40-35-114(3) as "a person or entity that is injured, killed, had

21

property stolen, or had property destroyed by the perpetrator of the crime") (footnote omitted). The defendant undoubtedly inflicted particularly great injury on Adrian Williamson by causing his death, and factor (6) is applicable to his sentence for aggravated burglary.

The trial court was also correct in enhancing the defendant's sentence for aggravated burglary because "the defendant had no hesitation about committing a crime when the risk to human life was high." See T.C.A. § 40-35-114(10). When determining the applicability of factor (10), we focus on whether the defendant created a high risk to human life. Jones, 883 S.W.2d at 602. This factor represents a legislative determination that "acts which cause high risk to human life may establish culpability beyond that necessary for conviction of a charged offense." Jones, 883 S.W.2d at 603. Thus, for factor (10) to apply, the facts establishing the high risk to human life must demonstrate a culpability greater than that incident to the offense. Id.

In this case, the facts that establish that the defendant created a high risk to human life also demonstrate a greater culpability than that incident to the offense of aggravated burglary. In addition to entering Ms. Woodson's apartment with the intent to assault her and cause serious bodily injury, the defendant created a high risk to human life when he caused Adrian Williamson's death. The trial court properly applied factor (10).

We also agree with the trial court's application of factor (16), regarding a great potential for bodily injury to a victim, to the defendant's sentence for aggravated burglary. We recognize that by enhancing the range of punishment for aggravated burglary, our legislature has acknowledged generally that a burglary of a habitation involves increased potential for bodily injury. See State v. Smith, 891 S.W.2d 922, 930 (Tenn. Crim. App.), app. denied (Tenn. 1994); State v. Avery, 818 S.W.2d 365, 369

22

(Tenn. Crim. App. 1991). However, application of factor (16) is similar to the application of factor (10) because "[t]he condition 'high risk of death' is not appreciably different from 'the [great] potential for bodily injury.'" Jones, 883 S.W.2d at 597 (Tenn. 1994). Thus, factor (16) can be applied to enhance a sentence for aggravated burglary when the facts establishing the great potential for bodily injury demonstrate a culpability greater than that incident to the general offense of aggravated burglary.

In this case, extraordinary circumstances exist to justify application of factor (16) to the defendant's sentence for aggravated burglary. In addition to kicking open the door and entering Ms. Woodson's apartment with the intent to cause her serious bodily injury, the defendant caused the death of Adrian Williamson. These facts establish a greater culpability than that incident to a mere burglary of a habitation and thus warrant application of factor (16) to the defendant's aggravated burglary sentence.

The trial court should not have enhanced the defendant's aggravated burglary sentence for the defendant being a leader in committing a crime that involved two or more criminal actors, see T.C.A. § 40-35-114(2), because there is no evidence that anyone other than the defendant participated in the offense. As previously noted, the defendant's conviction for aggravated burglary was based upon his entry into Ms. Woodson's apartment with the intent to commit aggravated assault. Although Mr. Underwood admitted entering Ms. Woodson's apartment that night, nothing in the record indicates that he did so with the intent to commit aggravated assault. To the contrary, all the proof at trial established that Mr. Underwood was not a party to the defendant's criminal conduct. Because Mr. Underwood did not participate in the aggravated burglary, the aggravated burglary did not involve two or more criminal actors, and factor (2) does not apply.

23

Although not applied by the trial court, we conclude that the record in this case also supports enhancement of the defendant's sentence for aggravated burglary based on factors (3) and (12). Factor (3) applies when an offense involves more than one victim. T.C.A. § 40-35-114(3). In the context of T.C.A. § 40-35-114(3), the term victim refers to a "person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime." Raines, 882 S.W.2d at 384. In this case, application of factor (3) is warranted because both Joanne Woodson and Adrian Williamson were victims of the defendant's aggravated burglary.

Application of factor (12) is appropriate when the defendant's actions during the commission of a felony result in the death or serious bodily injury of another person. T.C.A. § 40-35-114(12). In this case, factor (12) applies to the defendant's sentence for aggravated burglary because the defendant's actions during the commission of the aggravated burglary resulted in Adrian Williamson's death.

With respect to his sentence for aggravated assault, the defendant contends that the trial court erred by applying enhancement factors (2), (6), (10), and (16). We agree that the trial court erred by applying factors (2) and (6) but conclude that the trial court properly applied factors (10) and (16). Because we have modified the defendant's conviction from aggravated assault to assault, a class A misdemeanor, see T.C.A. § 39-13-101, we need not explain the trial court's errors in enhancing the defendant's sentence for aggravated assault, but will instead discuss the sentencing considerations applicable to the defendant's assault conviction.

Unlike felony sentencing, the law does not provide a presumptive minimum sentence for misdemeanor convictions. State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App.), app. denied (Tenn. 1994). Misdemeanor sentences are to be consistent with the purposes and principles of the 1989 Sentencing Act. T.C.A. § 40-

35-302(b). A court imposing a misdemeanor sentence is obligated to fix a percentage of the sentence that must be served before the defendant is eligible for release. T.C.A. § 40-35-302(d). The percentage of actual confinement that must be served is determined by considering the purposes, principles, enhancing, and mitigating factors of the act. Id.

Based on the seriousness of the defendant's assault on Ms. Woodson and the circumstances surrounding the assault, we conclude that a sentence of eleven months and twenty-nine days with a seventy-five percent release eligibility shall be imposed for the defendant's assault conviction. The defendant in this case violently forced his way into Ms. Woodson's apartment intending to inflict serious bodily injury upon her. He then beat her until she was unconscious, threw two jugs of water on her to revive her, and continued his rampage through the apartment causing Adrian Williamson's death. By imposing the maximum sentence for assault, we recognize the seriousness of the circumstances surrounding the assault. See T.C.A. § 40-35-102(1). In this respect, we note that the fact that Ms. Woodson's injuries were insufficient to support a conviction for aggravated assault does not make the defendant's conduct any less deplorable. In addition, the violent circumstances surrounding the defendant's assault on Ms. Woodson indicate a great potential for bodily injury and a high risk to human life. See T.C.A. § 40-35-114(10) and (16).

Regarding mitigation, the defendant argues that the trial court erred by refusing to mitigate all of his sentences based upon his age and his lack of a criminal record. See T.C.A. § 40-35-113(6), (13). The record supports the trial court's refusal to mitigate the defendant's sentence based upon his age. The defendant committed the present offenses four days before his twentieth birthday, and nothing in the record indicates that the defendant lacked substantial judgment because of his age. However, the trial court should have considered the defendant's lack of a prior criminal

25

record.  See State v. Thoma Shawn Noles and Michael Stanley, Nos. 01C01-9301-CC-00003 and 01C01-9301-CC-00005, Rutherford Co. (Tenn. Crim. App. Nov. 18, 1993), app. denied (Tenn. Apr. 4, 1994).

Although the presumption of correctness that accompanies the trial court's determinations has fallen because the trial court did not properly consider all of the relevant sentencing principles, see Ashby, 823 S.W.2d at 169, we affirm the defendant's sentences for aggravated burglary and criminally negligent homicide.  Even considering the defendant's lack of a prior criminal record as mitigation, the proof in this case supports a six-year sentence for aggravated burglary and a two-year sentence for criminally negligent homicide, given the circumstances surrounding the offenses under the applicable enhancement factors.  The defendant shall also serve an eleven-month-twenty-nine-day sentence with a seventy-five percent release eligibility date for assault.

**B**

Next, the defendant contends that the trial court erred in denying him probation.  He correctly asserts that he is presumed to be a favorable candidate for probation in the absence of evidence to the contrary, because he does not meet the description of one who should be given first priority regarding a sentence involving incarceration under T.C.A. § 40-35-102(5) and he was convicted of Class C and Class E felonies.  See T.C.A. § 40-35-102(6).[3]  However, as the Sentencing Commission Comments to T.C.A. § 40-35-303(b) state, although "probation must be automatically considered as a sentencing option for eligible defendants, the defendant is not automatically entitled to probation as a matter of law."  See State v. Fletcher, 805 S.W.2d at 787.

---

[3] The state incorrectly asserts that the defendant was convicted of a Class B felony and thus argues that he is not presumed to be a favorable candidate for alternative sentencing options under T.C.A. § 40-35-102(6).

The presumption of eligibility may be rebutted if any of the following factors outweigh the defendant's rehabilitative capabilities:  (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses, or (3) measures less restrictive than confinement have been frequently applied unsuccessfully to the defendant.  See T.C.A. § 40-35-103(1); State v. Ashby, 823 S.W.2d at 169; State v. Fletcher, 805 S.W.2d at 787-88.  The trial court relied upon the second sentencing consideration in denying probation, finding that confinement was necessary to avoid depreciating the seriousness of the defendant's actions and to deter others from committing similar crimes.  Because the record adequately supports this finding, the trial court was justified in denying probation.

## C

Finally, the defendant contends that the trial court should not have ordered consecutive sentencing.  We agree.  At the sentencing hearing, the trial court ordered the defendant's sentences to be served consecutively solely because it found the defendant to be a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high."  T.C.A. § 40-35-115(b)(4).  This finding alone will not justify consecutive sentencing.  State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

> [T]he imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed.

Id.

27

We conclude that the trial court erred in ordering the defendant to serve his sentences consecutively. The trial court did not make sufficient findings, and the record does not support consecutive sentences. There is no indication from the circumstances surrounding the offenses that consecutive sentencing is necessary to protect society from the defendant or that upon release he will be unwilling to lead a productive life and resort to criminal activity. See id; Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976).

In consideration of the foregoing, the defendant's convictions and sentences for aggravated burglary and criminally negligent homicide are affirmed. His conviction for aggravated assault is modified to assault, and a sentence of eleven months and twenty-nine days with a seventy-five percent release eligibility date imposed. All three sentences, though, shall be served concurrently to each other.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
Jerry Scott, Special Judge



_____
David H. Welles, Judge